**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MATTHEW S. DePERNO, an individual,
DePERNO LAW OFFICE, PLLC, a Michigan
professional limited liability company, and
TODD COURSER, an individual

      Plaintiffs,

v.

WASHTENAW COUNTY, a municipal
corporation and TIMOTHY P. CONNORS, an
individual

      Defendants.

_____/

Case No. _____

HON. _____

Matthew S. DePerno (P52622)
DePERNO LAW OFFICE, PLLC
Attorney for DePerno Law Office, PLLC and
   Matthew S. DePerno
951 W. Milham Avenue
PO Box 1595
Portage, MI 49081
(269) 321-5064

Todd A. Courser (P69829)
TODD A. COURSER & ASSOCIATES PLLC
Attorney for Todd A. Courser
455 S. Main St
Lapeer, MI 48446
(810) 245-0813

_____/

## COMPLAINT AND JURY DEMAND

      NOW COME Plaintiffs, MATTHEW S. DePERNO and DePERNO LAW OFFICE, PLLC,

by and through their attorney, DePERNO LAW OFFICE, PLLC, and Plaintiff TODD COURSER,

by and through his attorney, TODD A. COURSER & ASSOCIATES PLLC, and for their

Complaint against WASHTENAW COUNTY and TIMOTHY P. CONNORS state the following:

## INTRODUCTION

1.     This case is about Timothy P. Connors ("Connors"), a Circuit Court Judge and member of an esteemed profession who consistently and unabashedly abuses his badge of authority and misuses his government station for pecuniary gain and revenge.

2.     Defendant Connors, by and through the municipality of Washtenaw County, has used his powers and procedures as a weapon to the detriment of many people, including, but not limited to the Plaintiffs.

3.     Plaintiffs have been harmed emotionally, physically, and monetarily.

## JURISDICTION and VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1962 and 1964 and applicable state law.

5.     This Court has subject matter jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1985 and applicable state law.

6.     This Court also has original jurisdiction pursuant to 28 U.S.C. Section § 1331 (as this action involves a federal question and the laws of the United States) and 28 U.S.C. Section § 1343 (as this action involves the right to recover damages for injury and the deprivation of rights and privileges.)

7.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state-law claims that are related to, and form part of, the same case or controversy. It is appropriate that this Court exercise supplemental jurisdiction over the state law claims because they involve the same parties and operative facts as the federal claims. Therefore, the Court's exercise of supplemental jurisdiction will further economy, convenience, and fairness to the parties.

8.      Plaintiffs also seek declaratory and injunctive relief as authorized by Rules 57 and 65 of the Federal Rules of Civil Procedure and by the general legal and equitable powers of this Court.

9.      Venue is proper in this Court pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because all Defendants are residents of the State of Michigan and reside in, were found in, have an agent in, and conduct business and affairs in the Eastern District of Michigan. Further, a substantial part of the events or omissions of this Complaint occurred within the Eastern District of Michigan.

10.     Declaratory Relief is authorized Fed. R. Civ. P. 57.

11.     Plaintiffs request trial by jury, pursuant to Fed. R. Civ. P. 38.

12.     The amount in controversy exceeds $75,000.00.

## PARTIES

13.     Plaintiff MATTHEW S. DePERNO ("DePerno") is an individual attorney residing in Kalamazoo County, Michigan.

14.     Plaintiff DePERNO LAW OFFICE, PLLC ("DePerno Law") is a Michigan professional limited liability company with its office located in Kalamazoo County, Michigan.

15.     Plaintiff TODD COURSER ("Courser") is an individual attorney residing in Lapeer County, Michigan.

16.     Defendant WASHTENAW COUNTY is a public agency with its registered office located at 220 North Main Street, Ann Arbor, MI 48107.

17.     Defendant TIMOTHY P. CONNORS is an individual who resides in Washtenaw County and works as a circuit court judge in Washtenaw County and as a professor and/or lecturer at the University of Michigan Law School.

3

## FACTUAL BACKGROUND and COMMON ALLEGATIONS

### *Representation of Todd Courser*

18.     In December 2015, DePerno Law was hired by Courser to represent him regarding certain events that led up to and after Courser's constructive expulsion from the Michigan House of Representatives.

19.     The representation initially stemmed from certain events that occurred between January 2015 and September 2015, as detailed in this Complaint.

20.     In November 2014 Courser was elected as a Republican State Representative for the 82nd District.

21.     Courser immediately started an investigation into the Flint Water Crisis.

22.     Courser vowed that he would not vote to raise taxes, which was a problem for Republican leadership regarding their numerous bills collectively referred to as the "House Road Package."

23.     Courser was immediately labeled a problem by Republican House leadership and someone who had to be brought in line with the party caucus.

24.     Republican House leadership used Courser's legislative aides (Keith Allard ("Allard"), Benjamin Graham ("Graham"), and Joshua Cline ("Cline")) to dig up dirt on Courser.

25.     Allard, Graham, and Cline (acting as State employees) then conducted surveillance on Courser and accessed his private data, emails, text messages, and phone messages.

26.     Allard, Graham, and Cline also gained assistance from Joseph Gamrat ("Gamrat"), David Horr ("Horr"), and Vincent Krell ("Krell") to conduct surveillance.

27.     During the surveillance, Allard, Graham, Cline, Gamrat, Horr, and Krell discovered or confirmed that Courser was having an affair with Cindy Gamrat (now Cindy Bauer) ("Bauer"), another State Representative.

28.     Allard, Graham, Cline, Gamrat, and Horr then worked together to send Courser a series of extortion text messages from at least three "burner" phones. One of the phones was registered in the name of "C Livingood". The text messages demanded that Courser resign or "Chad gets it all."[1]

29.     The text messages contained information that was only available to people who had accessed Courser's private emails and information.

30.     On May 19, 2015, Courser met with Graham to discuss the extortion text messages, the affair, and how to deal with what was clearly a messaging problem.

31.     Unbeknownst to Courser, Graham was secretly recording the conversation. It was later discovered that Graham's boss (Allard) instructed Graham to record the meeting.

32.     The recording was approximately 1 hour and 40 minutes.

33.     Allard and Graham with the assistance of others (including The Detroit News, its attorneys, and Livengood) edited and manipulated the recording and removed at least 20 minutes. The parts of the recording that were removed included conversations about Courser and his family, conversations about Courser receiving text messages demanding that he resign from office, if Graham was aware of or involved in the text messages Courser had been receiving, and that Courser had been receiving these text messages from three separate phone numbers.

34.     The removed items were all important to the conversation and changed the context and motivation of the conversation.

---

[1] referencing The Detroit News reported Chad Livengood.

35.     When Courser refused to resign, the recording was published on August 7, 2015 by The Detroit News through a series of stories written by Chad Livengood ("Livengood"). The edited recording was played around the world and Courser was subjected to humiliation and shame. Even with this knowledge, Livengood never disclosed that the recording was edited and manipulated or that he was part of the editing process.

36.     The edited and manipulated recording was then used by the House to remove Courser from office. Even with this knowledge, Livengood never disclosed that the recording was edited and manipulated or that he was part of the editing process.

37.     The edited and manipulated recording was then used by the Michigan Attorney General's office to charge Courser with four felonies. Even with this knowledge, Livengood never disclosed that the recording was edited and manipulated or that he was part of the editing process.

38.     The edited and manipulated recording was then used by the Michigan Attorney Grievance Commission as a basis to investigate Coursers fitness as an attorney. Even with this knowledge, Livengood never disclosed that the recording was edited and manipulated or that he was part of the editing process.

39.     It was later discovered that a Republican party influencer named John Truscott had been hired to help Allard and Graham "manage their story;" that John Truscott introduced Allard and Graham to Livengood; and that John Truscott was helping to manage the stories presented by Allard and Graham about Courser through Livengood and The Detroit News. Even with this knowledge, Livengood never disclosed that he had been working for Truscott (as a party influencer) to manage stories for the benefit of Allard and Graham.

40.     It was later discovered that the recording had been edited and manipulated at the request of the attorneys for The Detroit News because the sections removed were deemed not

relevant to their story or would cause future legal ramifications for The Detroit News. Even with this knowledge, Livengood never disclosed that the recording was edited and manipulated or that he was part of the editing process.

41.     When Livengood published his first story on August 7, 2015 he did not disclose that the recording had been edited and manipulated, that important information and context had been removed, that he had been working with Truscott to manage the stories of Allard and Graham, or that The Detroit News was involved in the editing process and passed off the edited and manipulated version as an original.

42.     When Livengood published his first story on August 7, 2015, Brock Swartzle ("Swartzle") (the House legal counsel and Chief of Staff to Speaker of the House Kevin Cotter) implemented a "litigation hold" on all House emails and files, including all of Courser's personal files and his files regarding the Flint Water Crisis investigation.[2] Swartzle stated that he instructed House staff to "put on hold all electronic data of the House/Members/Staff."

43.     Prior to taking his job with the House, Swartzle was a partner with the law firm Honigman Miller Schwartz and Cohn LLP.

44.     The House then seized Courser's files, including his personal files, without a warrant. This included his files regarding the Flint Water Crisis investigation. Swartzle acknowledged that the House seized everything in Courser's office. "And so I was talking to him about 'Okay, close down their office, have somebody from our business office. Go down, take their hard files, take their computers.'"

---

[2] "We put in what I would – I was in private practice and litigation, what I would call litigation hold. So we had been saving emails, um, a couple weeks before because of something I had heard which concerned me. So we were saving all house emails, you know. No longer could an office push delete and it would delete it, so that was no longer an option."

45.     The "litigation hold" instituted by Swartzle contained over 15,000 files and millions of bytes of data. These files contained Courser's independent investigation into the Flint Water Crisis.

46.     The items in the "litigation hold"  were then deleted intentionally, through gross negligence, and with bad faith. Following the destruction of the files in the litigation hold, Brock Swartzle was appointed as a judge to the Michigan Court of Appeals by Governor Rick Snyder.[3]

47.     The subsequent cases (both civil and criminal) involving Courser were highly contentious because they involved political retribution by multiple government agencies in an attempt to silence Plaintiffs (both Courser and DePerno) from exposing various unconstitutional actions by the government, as briefly detailed above.

48.     During representation of Courser, DePerno has been harassed, threatened, and intimidated, his car has been broken into, files were stolen, and someone attempted to install a tracking device on his car.

49.     During representation of Courser, witnesses have been harassed, threatened, and intimidated.

50.     On August 6, 2018, Courser brought suit against Livengood and The Detroit News related to their actions in the scandal. The case was styled *Todd Courser v Chad Livengood and The Detroit News, Inc.*, Washtenaw County Circuit Court, Case No. 18-831-CZ. Exhibit 1, *First Amended Complaint.*

51.     Connors was the circuit court judge presiding over the case. The manner in which he was selected and assigned to the case is a question of fact to be determined through discovery.

---

[3] https://www.freep.com/story/news/local/michigan/2016/12/31/rick-snyder-judge-donald-owens/95909228/

52.     The essence of the lawsuit focused on the process and conspiracy of Livengood and The Detroit News ***to make the news***, rather than report the news; to edit and manipulate the recording to tell a story out of context; and to profit through their deceptive acts.

53.     During this process Livengood and The Detroit News allowed Courser to be subject to ridicule and scorn for bringing the truth to light. At the same time, Livengood and The Detroit News secretly hid the truth regarding the edited and manipulated recording.

54.     During this process Livengood and The Detroit News allowed DePerno and DePerno Law to be subject to ridicule and scorn for bringing the truth to light. At the same time, Livengood and The Detroit News secretly hid the truth regarding the edited and manipulated recording.

55.     In the briefest sense, the lawsuit alleged the following:

- Courser was elected to the Michigan State House of Representatives (the "House") and then sworn in to serve in January of 2015. *First Amended Complaint*, ¶8.

- On May 19, 2015, Courser's chief of staff, Keith Allard ("Allard") directed a subordinate legislative aide to secretly record a conversation with Plaintiff. That subordinate legislative aide was Benjamin Graham ("Graham"). Later that evening, Graham did, in fact, secretly record a conversation with Plaintiff. *Id*. at ¶9.

- The secret recording was made in conjunction with numerous other recordings that could be edited and spliced together to create a fictitious recording. *Id*. at ¶10.

- The May 19, 2015 recording was fabricated and not the original. *Id*. at ¶¶11, 15.

- At the same time, Courser was receiving extortion texts demanding that he resign from office. *Id*. at ¶¶11, 18, 46. The extortion texts stated that if Courser did not resign, Livengood would "get it all." *Id*. at ¶¶40, 122.

- The information contained in the extortion texts was private and obtained through illegal access to Courser's accounts. *Id*. at ¶¶26, 29, 37, 38.

- The phone used to send the extortion text was registered in the name of Chad Livengood (although spelled "Livingood"). *Id*. at ¶21.

- On August 7, 2015, Livengood started to publish a series of articles based on the extortion texts. Livengood became an overnight media figure. *Id*. at ¶33. He was invited on multiple media programs and received awards for his articles related to Courser and Cindy Gamrat. *Id*.

- Based on these recordings, the Michigan House of Representatives, through Brock Swartzle, conducted a rushed 2-week investigation after which Courser was constructively removed from office. *Id*. at ¶218.

- Courser was then charged with four felonies based on the edited recordings. *Id*. at ¶75.

- At no time during the House investigation or the criminal proceedings did Livengood or The Detroit News reveal that the recording was edited. *Id*. at ¶¶95-143. Rather, they allowed Courser to be removed from office and prosecuted based on false information without revealing the truth.

56.     One witness, Joshua Cline ("Cline") submitted an affidavit stating that he had first-hand knowledge that the May 19, 2015 recording was edited. Exhibit 2. He further stated the following:

- "In July 2015, I learned through Ben Graham and Keith Allard that John Truscott had been hired to help Keith Allard and Ben Graham manage their story. That John Truscott introduced Keith Allard and Ben Graham to Chad Livengood. John Truscott was helping to manage the stories presented by Keith Allard and Ben Graham about Todd Courser through Chad Livengood."

- "In July 2015, I also learned through Keith Allard, Ben Graham, and Chad Livengood, that they had edited the May 19, 2015 recording at the request of the attorneys of the Detroit News because those sections were deemed not relevant to the [sic] their story or would possibly cause future legal ramifications for the Detroit News."

57.     Livengood and The Detroit News were represented by Leonard Niehoff ("Niehoff") and Honigman Miller Schwartz and Cohn LLP ("Honigman Law"), the same firm that employed Swartzle before he took a job with the House. They had a motive to keep the truth from coming to light. Indeed, Niehoff and Honigman Law made intentionally false statements to the Connors and

hid the truth; all of which Connors intentionally or negligently ignored out of revenge and for his own personal gain.

58.     Livengood and The Detroit News filed a motion for summary disposition pursuant to MCR 2.116(C)(8) and for sanctions pursuant to MCR 2.114. The motion and brief contained no affidavits.

### *The February 21, 2019 Hearing*

59.     On February 21, 2019, Connors granted the motion for summary disposition and for sanctions against Courser and DePerno. Exhibit 3. DePerno Law was not sanctioned.

60.     At the February 21, 2019 hearing Connors demonstrated an appearance of bias and demonstrated his impartiality which might be questioned from the perspective of a reasonable person when he made condescending and derogatory comments against DePerno and Courser.

61.     The motion hearing was based on MCR 2.116(C)(8) and called for an analysis of whether Courser had stated a claim upon which relief could be granted. Connors was required to consider the allegations as true. However, at the hearing, Connors made judicial findings of fact that were diametrically opposed to the allegations in the complaint and the evidence presented at the hearing.

62.     Connor's statement demonstrated nonjudicial actions, not taken in his judicial capacity. Indeed, the only way for Connors to "learn" the facts of the case outside of the pleadings filed was to engage in independent research outside his judicial capacity and in his role as a university lecturer.

63.     Connor's went outside the record in order to arrive at his conclusions; thus depriving Plaintiffs of a fair opportunity to respond to his improper factual findings. In effect,

Connor's nonjudicial actions usurped the role of counsel and went beyond both his judicial capacity and his judicial mandate of impartiality.

64.     Indeed, during a subsequent motion to disqualify, Plaintiff argued that Connors' statement "demonstrates that Judge Connors may have personal knowledge of disputed evidentiary facts concerning the proceedings."

65.     When asked to explain his outside knowledge of facts, Connors refused to explain how he had additional knowledge about the facts or how he was in a position to make a determination at this stage of the case regarding "truth." Rather, he proudly explained and bragged about his lecturer experience and pedigree of accomplishments. Indeed, he proudly proclaimed that his experience as a lecturer is what defines him. Certainly, his comments demonstrate that he had knowledge of the facts different than those alleged, based his role at as lecturer.

66.     During the hearing, Niehoff argued that the facts set forth in the complaint were not true. This argument was strongly rebutted by DePerno in both the response brief and oral argument.

67.     Further, an affidavit later signed by Cline revealed that the facts presented in the complaint were true; to wit: The Detroit News' attorneys were involved in editing the recording. Connors ignored this evidence. Connors also ignored the false statements made by Niehoff, his friend and colleague, that were directly contradicted by the affidavit.

68.     In particular, Connors disparaged Courser when he stated, "This public official should acknowledge the inappropriate behavior that he engaged in in violation of the public trust as opposed to harassing those who brought it to light." This comment revealed that Connors had imposed his own sense of morality and knowledge of the allegations in the complaint, all without evidence to support his statements. Connors revealed that he did not think Courser had

appropriately taken responsibility. Connors stated that it was his opinion that Courser had engaged in inappropriate behavior that violated the public trust. None of this was supported by affidavits or evidence.

69.     Connors also disparaged DePerno and accused DePerno of violating his oath as attorney. Connors disparaged DePerno when he stated that certain facts presented with the complaint were not true. In particular, he stated that "this [case] does not have a reasonable basis that the underlying facts are true as represented." Not only would Connors have no basis to make this statement without outside assistance, but the comments were directly opposed to his duty to consider all facts as true, pursuant to MCR 2.116(C)(8). This demonstrated extreme bias.

70.     Connors comments revealed that he had personal knowledge of evidentiary facts concerning the proceeding not already presented to him. Whether Courser had or had not taken personal responsibility was irrelevant to whether Courser set forth valid claims. The comment demonstrated that the issue for the court was not whether valid claims existed, but rather whether Courser had taken personal responsibility. Connor's perception of the facts was that Courser did not; thus, he should not be filing a lawsuit. By doing so, he deprived Courser of his Constitutional rights to bring claims as an aggrieved party and to a fair hearing before an impartial judge. Connors' bias was on full display.

71.     Connors comments also demonstrated that he had personal knowledge of disputed evidentiary facts concerning the proceeding. But for his outside knowledge, he could not have otherwise abrogated his duty to consider the facts as true.

72.     It was clear that Connors applied outside knowledge, a subjective standard, ignored sworn evidence, and accepted unsworn non-evidentiary comments made by Niehoff. This demonstrated a biased subjective agenda.

73. Connors also granted the motion for summary disposition without considering the expert affidavit (Exhibit 4) and reports (Exhibit 5) submitted by Ed Primeau, which were at the heart of the Complaint stating that the recording was indeed a fabrication.

### *Motion to Disqualify Connors*

74. Following the hearing, Plaintiffs filed a motion to disqualify Connors based on his comments made during the hearing. Exhibits 6,[4] 7,[5] and 8.[6]

75. "Litigants have a due process right to a trial before a judge with no direct, personal, substantial pecuniary interest in the outcome, and the legitimacy of the judiciary rests on delivering on that promise and in furthering the public's trust in the integrity of its judges." *Carey v. Wolnitzek*, 614 F.3d 189, 204 (6th Cir. 2010).

76. In Washtenaw County and in front of Connors, that right is under attack.

77. In addition, following the hearing, Plaintiffs discovered that Connors and Niehoff have an ongoing relationship as colleagues at the University of Michigan.

78. Connors and Niehoff failed to disclose their close, personal and outside professional relationship at the time of the hearing. The failure to disclose was a disqualifying event.

79. Plaintiffs also discovered that a financial relationship existed between the University of Michigan (Connor's employer) and The Detroit News (a defendant in the case). This was not disclosed prior to the hearing and demonstrated a conflict of interest.

80. Neither The Detroit News nor any of their attorneys have ever disputed that such a financial relationship existed. They have only stated that it wasn't relevant.

81. Connors denied the motion to disqualify. Exhibit 9.

---

[4] Motion and Brief to Disqualify Judge Connors
[5] Plaintiff's Supplemental Brief as to Plaintiff's Motion to Disqualify Judge Connors
[6] Plaintiff's Second Supplemental Brief as to Plaintiff's Motion to Disqualify Judge Connors

82. Chief Judge Kunke subsequently denied the motion to disqualify on rehearing, despite the overwhelming evidence of bias. Exhibit 10.

### *Evidentiary Hearing*

83. At a subsequent evidentiary hearing on May 9, 2019, Connors granted Livengood and The Detroit News everything they asked for in attorney fees. Connors awarded them $79,701.63 claiming that was a "reasonable" amount for filing a motion to dismiss. An order was signed on June 13, 2019.

84. Connors awarded the sanctions without hearing from Rian Dawson, who was the attorney responsible for the much of the work performed.

85. Connors awarded the sanctions without properly removing block billing, double billings, duplicate billings, or billings with insufficient detail.

86. Connors awarded the sanctions without considering whether DePerno, DePerno Law, or Courser had the ability to pay a monetary sanction, or whether a different, less severe sanction was more appropriate. The failure to consider ability to pay is an abuse of discretion.

87. Also, out of revenge, Connors sanctioned Courser and DePerno[7] for filing the motion to disqualify; the very motion that exposed his bias and accused him of failing to unethically disclose his business and personal relationship with opposing counsel Niehoff.

88. Livengood and The Detroit News subsequently submitted an order for signature that imposed sanctions on Courser, DePerno, and DePerno Law. Connors signed the order despite objection that it was contrary to his initial order of sanctions against only DePerno and Courser. Exhibit 11.

---

[7] DePerno Law was not sanctioned at this time.

***Final Order and Appeal***

89.     On April 3, 2019, Courser (through his attorney) filed a motion for reconsideration regarding the motion for summary disposition and sanctions. Exhibit 12[8] and 13.[9] This motion specifically highlighted the Cline affidavit.

90.     On August 29, 2019, Connors denied the motion for reconsideration. Exhibit 14. This order was the "final order" in the case under MCR 7.202(6)(a)(i) because it disposed of all claims in the case.

91.     On September 17, 2019, Courser (through his attorney) filed a timely Claim of Appeal with the Michigan Court of Appeals. Exhibit 15.

92.     Pursuant to MCR 7.208(A), when the appeal was filed, Connors was divested of jurisdiction. "After a claim of appeal is filed or leave to appeal is granted, the trial court or tribunal may not set aside or amend the judgment or order appeal from except (a) by order of the Court of Appeals, (2) by stipulation of the parties, (3) after a decision on the merits in an action in which a preliminary injunction was granted, or (4) as otherwise provided by law." None of these exceptions apply in this case.

93.     However, on September 19, 2019, two days after the appeal was filed, Livengood and The Detroit News (through their attorneys) scheduled a hearing for October 10, 2019 to settle a proposed order and judgment. This was done without proper notice because they never served the proposed order as required by the court rule.

---

[8] Plaintiff's Motion and Brief for Reconsideration as to Defendants' Chad Livengood and Detroit News, Inc.'s Motion for Summary Disposition Pursuant to MCR 2.116(C)(8) of Plaintiff's First Amended Complaint and for Sanctions Pursuant to MCR 2.114
[9] Plaintiff's Supplemental Brief as to Plaintiff's Motion for Reconsideration

**_Judgment, without Notice_**

94.     On October 10, 2019, without proper notice or due process and acting without jurisdiction, Connors converted the sanctions to a money judgment.

95.     Acting without proper notice or due process and acting without jurisdiction, Connors signed an "Order and Judgment" against Plaintiffs. Exhibit 16. Conversion of a sanction to a money judgment is contrary to Michigan law.

96.     Connors acted in the complete and clear absence of jurisdiction because the Claim of Appeal had already been filed on September 17, 2019. MCR 7.208(A) divested Connors of jurisdiction. Indeed, MCR 7.208(A) is clear and unambiguous.

97.     Livengood and The Detroit News did not serve a copy of the proposed order prior to the hearing as required by MCR 2,602(B)(4).

98.     Connors only awarded sanctions. A sanction award is not a "judgment." Rather, a sanctions award is properly characterized as an order directing that an act be done instead of a money judgment in a civil action. Sanctions awards to collect attorney fees and costs are post-judgment proceedings. See _Fraser Trebilcock Davis & Dunlap PC v Boyce Trust 2350_, 304 Mich App 174, 219; 850 NW2d 537 (2014). Accordingly, a sanctions award is not a money judgment in a civil action. Rather, it is an order of the court directing a party to do an act — specifically, to pay the other party's attorney fees and costs.

99.     While acting without jurisdiction, there was no "judgement" to enter. Rather, a "trial court's sanctions order was an order direction an action to be done – payment of the other party's attorney fees and costs – not an order providing for a money judgment in an civil action." _Lech v Huntmore Estates Condo Ass'n_, 314 Mich App 288, 293; 890 NW2d 378 (2016). This decision

reiterates that sanctions are not treated as a claim for damages. Sanctions are not part of a money judgment.

100.    Livengood and The Detroit News were not entitled to a "judgment" because they did not file any complaint in the proceedings and therefore cannot be awarded a money judgment.

### *Writ of Execution and Debtor's Exam*

101.    Then on November 25, 2019, again out of revenge, bias, and hatred, Connors signed writs of execution; again without jurisdiction. Exhibit 17.

102.    Certainly, Connors had no jurisdiction to enter the money judgment. Therefore, he had no jurisdiction to enter a writ of execution on a judgment that was entered without jurisdiction. Further, Connors had no jurisdiction to enter the writs of execution.

103.    The writs of execution, in the amount of $79,701.63 also included "judgment interest" of $225.75; which is wholly improper.

104.    Connors had no authority to assess interest on a sanction award; let alone convert that sanction into a money judgment.

105.    Subsequent to signing the writs of execution, Plaintiffs were contacted by the Washtenaw County Sheriff's office which threatened to seize Plaintiffs' property at the demand of Connors.

106.    Connors authorized the Washtenaw County Sheriff to serve and execute on the writs of execution even though he no longer had jurisdiction in the case.

107.    These actions by Connors, taken without jurisdiction, subjected Plaintiffs to a loss of liberty and property without due process.

108.    Then on December 17, 2019, again out of revenge, bias, and hatred, Connors signed subpoenas ordering Plaintiffs to appear and testify as to their assets; again without jurisdiction. Exhibit 18. The scheduled date to appear was January 16, 2020.

109.    Connors had no jurisdiction to order and demand Plaintiffs appear for a debtor's exam and produce 8 years of information without due process.

110.    Connors had no jurisdiction to order and demand Plaintiffs preserve and make available to Livengood, The Detroit News, and their attorneys all information stored on their computers, including all attorney-client privilege, work product, and other privileged information.

***Continued Collection Efforts Despite Motion for Protective Order***

111.    On January 15, 2020, Plaintiffs filed a *Motion and Brief to Quash Subpoenas, for Protective Order, and for Sanctions*. A hearing was scheduled for February 6, 2020. Exhibit 19.

112.    Pursuant to MCR 2.506(H)(5) a party may move to quash or modify a subpoena by motion under MCR 2.302(C) filed before the time specified in the subpoena. In that case, the obligation to appear is stayed until the motion is resolved.

113.    On January 16, 2020, the creditor's exam was adjourned until February 6, 2020. This was confirmed by attorney Paul Stoychoff ("Stoychoff"). Exhibit 20.

114.    On February 4, 2020, Stoychoff contacted Courser directly. Exhibit 21. Stoychoff discussed settlement of the money judgment. Stoychoff also told Courser that because of an impending snow storm scheduled for February 6, 2020, he was adjourning his creditor exams.

115.    This direct contact violated MRPC 4.2(a) which prohibits Stoychoff from communicating directly with Courser, who was represented by DePerno Law. Stoychoff did not have consent from DePerno to contact Courser directly and was not authorized to do so.

116.    As a result of Stoychoff's communication, the motion to quash and motion for protective order was also adjourned. Exhibit 22.

117.    Communications through the trial court's e-file system show that Stoychoff received notice of the Re-Notice of Hearing and show that the trial court accepted the Re-Notice of Hearing. Exhibit 23.

118.    The trial court's Register of Actions dated February 5, 2020 at 3:35 PM shows that the hearing was adjourned. Exhibit 24.

119.    Nevertheless, Stoychoff then sabotaged the process and appeared before Connors on February 6, 2020 at 9:50 am, with full knowledge that the hearing was adjourned.

120.    Based on Stoychoff's direct communication with Courser and the resulting Re-Notice of Hearing, Plaintiffs did not appear in court on February 6, 2020.

121.    Nevertheless, Stoychoff proceeded with the hearing. This hearing was *ex parte* and unethical.

122.    Stoychoff made false and misleading statements on the record. Stoychoff stated that he didn't know about any adjournment (a lie). He stated that he received no emails (a lie). He admitted that he contacted Courser directly, but then stated that he didn't "remember" telling Courser to not appear (a lie).

123.    Connors in a corrupt manner and without jurisdiction and with the clear intent to proceed with the hearing made false and misleading statements on the record. Connors stated that he "confirmed nobody in my office granted an adjournment . . . granted an adjournment of their motion without date."

124.    The court's own records (Ex 23 and 24) show that the court accepted the Re-Notice of Hearing and in fact "Adjourned" the hearing.

125.   At that time, Stoychoff demanded a bench warrant be issued against Plaintiffs. In fact, he had the bench warrants prepared and in his possession at the time of the hearing because he know Courser and DePerno would not appear because he told them not to appear.

126.   Stoychoff knew the motion for protective order had been adjourned. Indeed, Stoychoff as demonstrated above, he had received an email directly from info@truefiling.com at 11:20 AM on February 5, 2010, stating that the "Re-Notice of Motion Hearing and Proof of Service (PDF) 020520 [Signed]" had been filed. Ex 23.

127.   That email provides a direct link to the Re-Notice of Hearing for instant download.

128.   Stoychoff stated "[a]lso, I spoke with Mr. DePerno this morning and he made some reference about how he contacted your court and asked for an adjournment. That was the first I knew about it and he stated that I had asked for an adjournment because of the snow. I don't remember saying that, Your Honor."

129.   This statement is false. First, DePerno never stated that he "asked for an adjournment." Rather, DePerno filed a Re-Notice of Hearing, as is his right. Second, Stoychoff received notice of the adjournment through the court's filing system. Third, Stoychoff didn't deny saying that he had asked for an adjournment because of the snow, he only stated that he "do[esn't] remember saying that." Fourth, the court itself accepted, processed, and adjourned the hearing.

130.   Stoychoff further stated that he contacted Courser directly and that Courser said "I am an attorney. You can talk to me directly." That is false. Stoychoff had violated the rules of ethics when he contacted Courser directly. There are reasons opposing counsel are not permitted to contact opposing clients; because it causes confusion.

131.    Connors, because of his bias and because of his revenge, refused and failed to properly inquire about these false statements or attempt to contact DePerno during the *ex parte* hearing.

132.    During the hearing, Connors stated that he would check with his staff to see if there was an adjournment. He left the bench. When he returned, he stated, "Yes, I confirmed nobody in my office granted an adjournment . . . granted an adjournment of their motion without date, we don't do that."

133.    That statement is false. There was never "an adjournment without date." Rather, the motion was adjourned to March 12, 2020 because that was the next available Thursday after Stoychoff stated he would not appear because of the anticipated snow.

134.    Further, the court accepted the filing and rescheduled the hearing, as demonstrated by the court's electronic filing system and the trial court's own Register of Actions.

135.    Therefore, Connors knew the Re-Notice of Hearing had already been filed because it was present of the court's system at the time he made the false statement that there was no adjournment.

136.    Connors then denied Plaintiffs' motion for protective order even though he had no jurisdiction to do so.

137.    All of these actions were taken by Connors in the complete and clear absence of jurisdiction.

138.    A party's right to request a ruling from a Michigan court is governed by the Michigan Court Rules, which provide that "[a]n application to the court for an order in a pending action must be by motion." MCR 2.119(A)(1). By extension, a court should not rule on a motion unless that motion is pending before it as set forth in the same rule.

139.   Plaintiffs' motion for protective order was not before Connors when he denied it. It had already been adjourned with the court's permission.

140.   Although a court does have the limited power to enter orders *sua sponte*, those rights are not unlimited. *Al-Maliki v. La Grant*, 781 N.W.2d 853, 855 (Mich. App. 2009) (a trial court's power to issue an order on summary disposition *sua sponte* is limited); *see also Harris v. Oliver*, No. 263172, 2006 WL 3333707, at *1 (Mich. App. Nov. 16, 2006). And, the court cannot exercise its rights to rule *sua sponte* "in contravention of a party's due process rights." *Al Maliki*, 781 N.W.2d at 855.

141.   A party's due process rights include notice and an opportunity to be heard. *See Taylor v. Williams*, No. 1:12-cv-281, 2012 WL 6201208, at *12 (W.D. Mich. Dec. 12, 2012) (Maloney, J.).

142.   Thus, when Connors ruled *sua sponte* on an issue without providing Plaintiffs notice or an opportunity to be heard, much less in the clear absence of a pending motion that had been adjourned, Connors was acting without jurisdiction.

143.   Interestingly, Stoychoff announced to Connors that he had already prepared and brought with him bench warrants. He did so because he knew Plaintiffs would not appear because he had already received notice of the adjournment and because he told Courser he did not have to appear.

144.   Stoychoff also apparently demanded that Connors issue a subpoena in the name of "Laura DePerno"; DePerno's wife. This is clearly designed to harass and intimidate. This bench warrant in the name of counsel's wife was signed by Connors in the complete and clear absence of jurisdiction.

145.    Connors complied and issued a subpoena for Laura DePerno. <u>Exhibit 25</u>. The subpoena was issued in violation of MCL 600.6110, which requires Stoychoff to file an affidavit verifying that Laura DePerno "has money or property of the judgment debtor." No such affidavit was filed, which makes the affidavit invalid and void *ab initio*.

146.    The failure to file the required affidavit means that Connors was acting without jurisdiction when he signed the subpoena.

147.    By signing this subpoena in violation of MCL 600.6110, Connors continues to demonstrate his willingness to violate the law and violate the Constitutional rights of Plaintiffs.

148.    Connors then signed and issued the two bench warrants (<u>Exhibit 26</u>) commanding the Sheriff's Office of Washtenaw Sheriff to arrest DePerno and Courser. The "motion affidavit" contained within the bench warrant is false. DePerno and Courser did not "fail to appear" at the hearing as demonstrated herein; proven by the exhibits attached (Ex. 22, 23, 24).

149.    Stoychoff's false statements to Connors both on the record and through his affidavit and then Connors signing the bench warrants amount to perjury committed in courts (MCL 750.422), perjury (MCL 750.423), misconduct in office and common-law obstruction of justice (MCL 750.505), and conspiracy to obstruct justice (MCL 750.157a).

150.    The actions on February 6, 2020 were taken by Connors in the complete and clear absence of jurisdiction and with the intent to harm Plaintiffs and out of revenge. Connors actions were malicious, corrupt, performed in bad faith, and with malice. This is demonstrated by the fact that Connors conducted an *ex parte* hearing; never made the effort to call DePerno or Courser during the hearing to ask why they had not appeared; and conducted the *ex parte* hearing at a time when Connors knew the motion for protective order had been adjourned and the subpoena was subject to a stay under MCR 2.506(H)(5).

## COUNT 1
## VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS UNDER 42 U.S.C. § 1983

### (against Connors)

151.   Plaintiffs restate and incorporate as if set forth fully herein all preceding allegations contained in this Complaint.

152.   Based on the facts set forth herein and in the proceeding paragraphs, Connors is liable to Plaintiffs for violation of his civil rights under 42 U.S.C. § 1983.

153.   Pursuant to 42 U.S.C. § 1983, every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..

154.   Connors is a state actor acting under the color of law acting in his capacity as circuit court judge and employee of Washtenaw County and reporting to Washtenaw County. In that capacity, Connors abused his badge of authority and misused his government station for pecuniary gain and revenge.

155.   Connor's actions demonstrate that he acted in the complete and clear absence of jurisdiction.

156.   Connor's actions further demonstrate that they were nonjudicial acts not taken in the judge's judicial capacity.

157.   Connor's repeated efforts to conduct hearings and sign orders at a time when he had no jurisdiction violated Plaintiffs' rights as guaranteed by the Fourteenth Amendment to the United States Constitution.

158. Connors' failure to advised Plaintiffs of inherent conflicts of interest violated Plaintiff's rights as guaranteed by the Fourteenth Amendment to the United States Constitution.

159. Indeed, Connors' actions were undertaken with evil motive or intent towards Plaintiffs' and reckless disregard or callous indifference to the Constitutional rights of Plaintiffs.

160. The conduct of these Defendants, under the color of law, offends the community's sense of fair play and decency.

161. Connors acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to Plaintiffs.

162. All of the Defendants in this case, working in conjunction with one-another created a plan to punish Plaintiffs in violation of the US Constitution and Michigan Constitution, all for their own power, retribution, personal gain, and revenge. All Defendants have engaged in these conspiracies as described herein.

163. The actions of Defendants deprived Plaintiffs of their rights, privileges, and immunities secured by the Constitution and laws. In fact, Defendants, when acting under color of State law, must respect fundamental human rights and personal immunities.

164. These guarantees were violated when Defendants' conduct deprived Plaintiffs of liberty and failed to respect decencies of civilized conduct to the extent that it "shocks the conscience." This occurred, in part, when Defendants failed to disclose conflicts of interest and signed orders without jurisdiction. This also occurred when Defendants did not give Plaintiffs adequate notice of the judgment to be entered,; thereby depriving Plaintiffs of due process of law so comprehensively as to "shock the conscience" in violation of the due process clause of the United States Constitution and the Michigan Constitution.

165.     These Defendants violated Plaintiffs' rights under the Fourteenth Amendment's guarantee that these Defendants, when acting under color of State law, must respect fundamental human rights and personal immunities.

166.     This guarantee was violated when Defendants' conduct deprived Plaintiffs of liberty and failed to respect decencies of civilized conduct to the extent that it "shocks the conscience."

167.     These Defendants violated Plaintiff's substantive rights under the Due Process Clause of the Fourteenth Amendment not to be deprived of liberty and property without due process of law.

168.     These Defendants also violated Plaintiffs' substantive rights under the Equal Protection Clause of the Fourteenth Amendment not to be deprived of equal protection of the laws.

169.     These Defendants also violated Plaintiffs' rights under the Fourth Amendment to be secure in their person and property and free of unreasonable seizure when they illegally and unlawfully subjected Plaintiff to a "debtor's exam" without consent.

170.     These Defendants also violated Plaintiffs' rights under the Fourth Amendment to be secure in their person and property and free of unreasonable seizure when they illegally and unlawfully signed Writs of Execution and Subpoenas authorizing government agencies to confiscate and seize Plaintiffs' property without a warrant or probable cause.

171.     These Defendants also violated Plaintiffs' rights under the Eight Amendment's Excessive Fines Clause, which includes state impositions.

172.     Indeed, the Eight Amendment's Excessive Fines Clause is an incorporate protected applicable to the States under the Fourteenth Amendment's Due Process Clause.

173.    The Fourteenth Amendment's Due Process Clause incorporates and renders applicable to the States Bill of Rights protections fundamental to our scheme of ordered liberty and deeply rooted in this Nation's history and tradition.

174.    Protection against excessive fines has been a constant shield throughout this Nation's history for good reason. Such fines, like the sanctions in this case converted to a money judgment undermine Plaintiffs' liberties. Indeed, in this case, they have been used to retaliate against Plaintiffs and chill the speech of political enemies.

175.    Such fines are also being used in this case, not in service of any just punishment, but instead as a source of revenue for Defendants, through the relationships established with Niehoff and Honigman Law.

176.    Defendants violated Plaintiffs' Constitutional rights when they assessed a fine of $79,701.63, then added interest, and then converted the sanctions to a monetary judgment without jurisdiction, and then issued subpoenas, writs, and further court orders without jurisdiction.

177.    Indeed, by converting the sanction to a money judgment, Connors has permitted Livengood and The Detroit News (through their attorneys) to do what Connors could not do himself, to wit: engage in collection actions pursuant to MCL 600.6110 through seizure, levy, and harassment.

178.    By not requiring Livengood and The Detroit News to file a lawsuit, but instead merely granting them a money judgment, in violation of the law and without the opportunity to be heard, Connors eliminated due process.

179.    Plaintiffs are now in jeopardy of losing their law practices and income. Their practice is now in jeopardy due to the ongoing stain and stigma and the further actions by these

Defendants. He has suffered irreparable harm economically, mentally, emotionally, personally, and professionally.

180.    As a direct and proximate result of Connors' acts, Plaintiffs suffered harm.

181.    Connors' use of his badge of authority as a Washtenaw County judge, and in conjunction with Washtenaw County, as well as his inappropriate relationship with Niehoff, and clear predetermined efforts to sanction Plaintiffs, convert the sanction to a money judgment without jurisdiction, and then seize Plaintiffs property and destroy their liberty and livelihood, violated the rights of Plaintiffs as guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution and the Michigan Constitution.

182.    Defendants are jointly, severally, and/or alternatively liable to Plaintiffs for all of his injuries and damages.

WHEREFORE, As a result of Defendants' actions and conduct, Plaintiffs have suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 2
## VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (against Washtenaw County)

183.    Plaintiffs restate and incorporate as if set forth fully herein all preceding allegations contained in this Complaint.

184.    Washtenaw County was aware that Connors used his positions to peddle influence, trade favors, and harm litigants in both the civil and criminal courts of Washtenaw County.

185.    Indeed, it was no secret that Connors has been investigated previously for failing to adhere to ethical standards.

186.    Indeed, Connors had previously been accused of conflicts of interest in accepting campaign donations from attorneys appearing before him. He apparently didn't disclose those relationships either. Rather, attorneys who appeared before Connors contributed more than $8,000 to his campaign, during pending cases. During the investigation, it was stated that: "The trial court, remaining on this case, would violate the relevant Michigan Court Rule, as well as the Michigan Code of Judicial Conduct/Canons of Ethics, and would deny the Intervening Victims that process of law to which they are due."

187.    There were further allegations that Connors ruled in favor of a lawyer who served on his re-election committee. And contrary to his biased admonishments against Plaintiffs in this case, Connors, as a public official, never acknowledged the inappropriate behavior that he engaged in in violation of the public trust.

188.    Indeed, Washtenaw County knew that its resources were being used and its employees were actively participating in a scheme to harm Plaintiffs. Washtenaw County had knowledge that Connors was violating the law and acting without jurisdiction to the detriment of Plaintiffs. Washtenaw County purposely turned a blind eye or in the very least was deliberately indifferent to Connors' action because they did not and have not removed him from office or taken some other remedial action to prevent further harm.

189.    Thus, Washtenaw County has sat idly by when Connors oversees cases involving the University of Michigan where he is employed without disclosing that conflict to other parties and attorneys. There are presently multiple cases in Washtenaw County assigned to Connors

involving the University of Michigan where Connors and Washtenaw County have never disclosed their relationship.

190.    Washtenaw County has sat idly by when Connors oversees cases involving Niehoff and Honigman Law as opposing counsel without disclosing that conflict to other parties and attorneys.

191.    Had Washtenaw County not been deliberately indifferent, this case and other cases would have been reassigned to another judge and Plaintiffs would never have suffered the indignity, mental distress, or expense caused by this unfounded conversion of a sanction to a money judgment without jurisdiction.

192.    Had Washtenaw County not been deliberately indifferent, Plaintiffs would not have incurred costs and loss of liberty as associated with the orders Connors signed without jurisdiction.

WHEREFORE, As a result of Defendants' actions and conduct, Plaintiffs have suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 3
## VIOLATION OF 42 U.S.C. § 1985

193.    Plaintiffs restate and incorporate as if set forth fully herein all preceding allegations contained in this Complaint.

194.    Based on the facts set forth herein and in the proceeding paragraphs, all of the Defendants are liable to Plaintiffs for conspiracy to violate their constitutional rights under 42 U.S.C. § 1985.

195.    Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law and are therefore liable to Plaintiffs.

196.    The actions by Defendants demonstrate a well-organized plan to damage Plaintiffs in order to satisfy their own reputations and standing within the community; as well as preserve Connor's status and employment with The University of Michigan.

197.    Defendants and/or an agent thereof engaged in a concerted action.

198.    The action was designed to accomplish either an illegal, unethical, or unlawful purpose, or a lawful purpose by illegal, unethical, or unlawful means.

199.    Defendants and/or an agent thereof illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal, unethical, and unlawful purpose of conduct damaging Plaintiffs.

200.    As a result of the conspiracy and Defendants and/or an agent thereof illegal, wrongful, or tortious acts, Plaintiffs sustained damages.

201.    Defendants are jointly, severally, and/or alternatively liable to Plaintiffs for all of his injuries and damages.

202.    As a direct and proximate cause of the violations described in this Complaint, Plaintiffs have suffered and continue to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. Plaintiffs is entitled to compensatory, exemplary, and punitive damages.

WHEREFORE, As a result of Defendants' actions and conduct, Plaintiffs have suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual

attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 4
## ABUSE OF PROCESS and POWER

203.   Plaintiffs restate and incorporate as if set forth fully herein all preceding allegations contained in this Complaint.

204.   Defendants have conducted this case through the Washtenaw County circuit court with an ulterior purpose. Their intention was to let all attorneys would know they cannot sue The Detroit News (an asset of the University of Michigan) and client of Honigman Law, represented by Connors good friend and colleague Niehoff, and former partner of Schwartzle.

205.   This conduct was improper in the regular prosecution of the underlying litigation. Connors bias was clear. Connors intended to protect his friends and assets of his employer, The University of Michigan, as well as his work colleague, Niehoff.

206.   Connors failed and refused to reviewed affidavits.

207.   The money judgment arose out of a situation where Livengood, The Detroit News, Niehoff, Honigman Law, and Connors used a legal procedure for an improper purpose (harassing and threatening litigations who sue The Detroit News) given the intended use of that procedure. The act of imposing sanctions and then converting those sanctions without jurisdiction was improper in the regular prosecution of the underlying litigation. In fact, Defendants used the underlying litigation for the improper money judgment as a collateral attack on Plaintiffs.

208.   The process of the underlying litigation was misused for a purpose other than that which is was designed to accomplish. The Defendants used the underlying litigation to send a message to litigants that they are not permitted to sue The Detroit News. This is an irregular act in the use of the process.

209.    Defendants harbored bad motives which then manifested in issuing the money judgment without jurisdiction; and then in issuing the subpoenas, writs of execution, and then subsequent orders.

210.    The tactics and procedure of Defendants demonstrates and was driven by a bad and improper motive to threaten Plaintiffs and cause them damages.

211.    The tactics, procedure, and bad motive are corroborated by Defendants actions without jurisdiction. The tactics, procedure, and bad motive are further corroborated by Connors subpoenas, writs of execution, and then subsequent orders when he knew he no longer had jurisdiction.

WHEREFORE, As a result of Defendants' actions and conduct, Plaintiffs have suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 5
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

212.    Plaintiffs restate and incorporate as if set forth fully herein all preceding allegations contained in this Complaint.

213.    The Defendants' conduct of bias and personal attacks, and then the assessment of a fine of $79,701.63, then added interest, and then conversion of those sanctions to a monetary judgment without jurisdiction, and then issuance of subpoenas, writs, and further court orders without jurisdiction is widely regarded as extreme and outrageous conduct.

214.    The Defendants' actions were intentional and knowingly without jurisdiction and were done with revenge and reckless disregard to the harm that might be caused to Plaintiffs.

215.    As the result of the actions of Defendants, Plaintiffs have suffered severe emotional distress.

WHEREFORE, As a result of Defendants' actions and conduct, Plaintiffs have suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 6
## CONSPIRACY and CONCERT OF ACTIONS

216.    Plaintiffs restate and incorporate as if set forth fully herein all preceding allegations contained in this Complaint.

217.    Defendants acted tortiously.

218.    Defendants knowingly acted without jurisdiction.

219.    Defendants acted pursuant to a common design.

220.    At all relevant times, Defendants engaged in concerted activities described in the preceding paragraphs by express or implied agreement.

221.    This concerted action was intended to, among other things, in order to destroy Plaintiffs, embarrass Plaintiffs, threaten Plaintiffs, cast Plaintiffs in a false and misleading light, and cause Plaintiffs harm and damages as described in this Complaint.

222.    Plaintiffs are not able to identify all of the activities of Defendants due to the generic similarity of such activities engaged in and promoted by Defendants and/or an agent

thereof; but has provided details herein of the many activities engaged in and promoted by Defendants.

223. As a direct and proximate result of Defendants' concerted activities, Plaintiffs have sustained, and will continue to sustain, severe injuries and damages.

224. Due to the concert of action among Defendants and/or an agent thereof, each is liable to Plaintiffs for these injuries and damages even if there was no directed relation to the aforementioned activities conducted by any one particular person, party, or agent thereof.

225. Defendants are jointly, severally, and/or alternatively liable to Plaintiffs for all of their injuries and damages.

226. Plaintiffs are entitled to exemplary and punitive damages.

227. As a direct and proximate cause of the violations described in this Complaint, Plaintiffs has suffered and continue to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, legal expenses, and loss of earning capacity. Plaintiffs are entitled to compensatory, exemplary, and punitive damages.

WHEREFORE, As a result of Defendants' actions and conduct, Plaintiffs have suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 7
## DECLARATORY RELIEF

228. Plaintiffs restate and incorporate as if set forth fully herein all preceding allegations contained in this Complaint.

229.     Plaintiffs seek declaratory relief stating that the actions of Defendants were unconstitutional and that Defendants acted without jurisdiction, causing Plaintiffs ongoing damages.

230.     Plaintiffs seek declaratory relief stating that the actions of Defendants violated Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment not to be deprived of liberty and property without due process of law.

231.     Plaintiffs seek declaratory relief stating that the actions of Defendants violated Plaintiffs' substantive rights under the Equal Protection Clause of the Fourteenth Amendment not to be deprived of equal protection of the laws.

232.     Plaintiffs seek declaratory relief stating that the actions of Defendants violated Plaintiffs' rights under the Fourth Amendment to be secure in their person and property and free of unreasonable seizure when they illegally and unlawfully subjected Plaintiff to a "debtor's exam" without consent.

233.     Plaintiffs seek declaratory relief stating that the actions of Defendants violated Plaintiffs' rights under the Fourth Amendment to be secure in their person and property and free of unreasonable seizure when they illegally and unlawfully signed Writs of Execution, Subpoenas, and Bench Warrants authorizing government agencies to confiscate and seize Plaintiffs' property and liberty without a warrant, probable cause, or due process.

234.     Plaintiffs seek declaratory relief stating that the actions of Defendants violated Plaintiffs' rights under the Eight Amendment's Excessive Fines Clause, which includes state impositions.

235.     An actual controversy exists concerning whether the actions taken by Defendants were constitutional.

236.    A judicial determination resolving this actual controversy is necessary and appropriate at this time.

WHEREFORE, Plaintiffs request this Court enter declaratory judgment stating that Defendants actions were and continue to be unconstitutional and that Plaintiffs have suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

## COUNT 8
## INJUNCTIVE RELIEF

237.    Plaintiffs restate and incorporate the preceding paragraphs as though set forth fully herein.

238.    Defendants' actions are unconstitutional.

239.    Defendants have acted without jurisdiction.

240.    Defendants continue to act in an unconstitutional manner and without jurisdiction.

241.    In the event that the Court determines Defendants' actions were improper, the Court should issue an order to provide an equitable remedy.

242.    Plaintiffs do not have a plain, speedy, and adequate remedy in the ordinary course of law.

243.    Plaintiffs asks this Court for an order stating that Defendants acted without jurisdiction with they entered the Judgment dated October 10, 2019.

244.    Plaintiffs asks this Court for an order stating that Defendants acted without jurisdiction with they entered the Writs of Execution, Subpoenas, and Bench Warrants.

WHEREFORE, Plaintiffs request this Court enter injunction relief stating that Defendants actions were and continue to be unconstitutional and that the Judgment dated October 10, 2019, and the subsequent Writs of Execution, Subpoenas, and Bench Warrants shall be vacated because they were entered at a time when Defendants did not have jurisdiction; and further stating that laintiffs have suffered damages in an amount of no less than $75,000.00 for the injuries sustained plus additional damages as may be proven to compensate them for losses and damages demanded in this Complaint, plus exemplary and punitive damages, together with interest, costs, and actual attorney's fees incurred in maintaining this matter, and for such further relief as the Court deems appropriate.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

Dated: February 9, 2020

*/s/ Matthew S. DePerno*
Matthew S. DePerno (P52622)
Attorney for DePerno Law Office, PLLC and
  Matthew S. DePerno
951 W. Milham Avenue
PO Box 1595
Portage, MI 49081
(269) 321-5064

Respectfully submitted

TODD A. COURSER & ASSOCIATES PLLC

Dated: February 9, 2020

*/s/ Todd A. Courser*
Todd A. Courser (P69829)
Attorney for Todd A. Courser
455 S. Main St
Lapeer, MI 48446
(810) 245-0813

## DEMAND FOR JURY TRIAL

Plaintiffs, by and through his attorneys DePERNO LAW OFFICE, PLLC and TODD A. COURSER & ASSOCIATES PLLC hereby demand a trial by jury in the above entitled matter as to all issues and claims for which a jury trial is allowed.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

Dated: February 9, 2020

/s/ Matthew S. DePerno
Matthew S. DePerno (P52622)
Attorney for DePerno Law Office, PLLC and
  Matthew S. DePerno
951 W. Milham Avenue
PO Box 1595
Portage, MI 49081
(269) 321-5064

Respectfully submitted

TODD A. COURSER & ASSOCIATES PLLC

Dated: February 9, 2020

/s/ Todd A. Courser
Todd A. Courser (P69829)
Attorney for Todd A. Courser
455 S. Main St
Lapeer, MI 48446
(810) 245-0813